# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 13, 2014   Decided September 2, 2014

No. 12-5217

MENOMINEE INDIAN TRIBE OF WISCONSIN,
APPELLANT

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-00812)

———

*Geoffrey D. Strommer* argued the cause for appellant. With him on the briefs was *Marsha K. Schmidt*. *F. Michael Willis* entered an appearance.

*Donald E. Kinner*, Assistant Director, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *Stuart F. Delery*, Assistant Attorney General. *Jeanne E. Davidson*, Attorney, entered an appearance.

Before: GARLAND, *Chief Judge*, and TATEL and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge:* Federal law requires that a claim for breach of a self determination contract between an Indian Tribe and a federal agency be filed with a contracting officer at the agency within six years of the claim's accrual. The Menominee Indian Tribe of Wisconsin filed claims in 2005 against the Department of Health and Human Services for unpaid contract support costs that accrued from 1996 through 1998—more than six years earlier. This case requires us to determine whether, pursuant to the doctrine of equitable tolling, the Tribe may sue even though the statute of limitations has lapsed. Equitable tolling is only available to a party who can show, *inter alia*, that "'some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). The Menominee Tribe identifies two circumstances that it suggests are "extraordinary" under *Holland*. First, the Tribe contends that it did not file timely claims because it believed that, as a member of a federal class action filed by another tribe, it was entitled to a different form of tolling—class-action tolling—that it believed afforded it two additional years beyond the statutory limitations period. Second, the Menominee Tribe contends that adverse legal precedent (which has since been reversed) led it to believe during the limitations period that its claims had no hope of success, so the Tribe refrained from the apparently futile act of filing them. We conclude that the legal misunderstandings and tactical mistakes the Tribe has identified here, however, do not amount to "extraordinary circumstance[s]" justifying equitable tolling. The Menominee Tribe's claims are thus barred by the statute of limitations.

3

**I.**

Between 1995 and 2004, the Menominee Indian Tribe of Wisconsin ("the Menominee Tribe" or "the Tribe") provided healthcare services to its members pursuant to a self determination contract with the Secretary of Health and Human Services (HHS). *Menominee Indian Tribe of Wis. v. United States* (*Menominee I*), 539 F. Supp. 2d 152, 153 (D.D.C. 2008). The Indian Self Determination and Education Assistance Act, 25 U.S.C. § 450 *et seq.* (2012) ("ISDA" or the "Act"), authorizes such contracts to encourage tribal participation in, and management of, programs that would otherwise be administered on Indian Tribes' behalf by the Department of the Interior and HHS. *See id.* §§ 450a, 450f. The Act requires the Secretary of the Interior and the Secretary of HHS to turn over direct operation of certain federal Indian programs to any Indian tribe that wishes to run those programs itself. *See id.* § 450f(a); *see also id.* § 450a(b). A "self determination contract" is the vehicle for transferring those programs. *Id.* § 450b(j).

Pursuant to a self determination contract, the government agrees to pay a participating tribe what it would have cost the federal agency to provide the services had the agency implemented the program itself. *See id.* § 450j-1(a)(1). Since 1988, the Act has also required that tribal contractors be reimbursed for "contract support costs"—additional reasonable overhead and other specified indirect costs that tribes incur. *Id.* § 450j-1(a)(2), (3); *see generally* ISDA Amendments of 1988, Pub. L. No. 100-472, § 201, 102 Stat. 2285 ("1988 Amendments"); S. Rep. No. 100-274, at 8-13 (1987). Tribes and the government negotiate the services and the attendant contract support costs through annual funding agreements, which become part of their self determination contracts. *See* 25 U.S.C. § 450*l*(c).

4

Parallel but mutually exclusive paths for resolving disputes relating to self determination contracts are set forth in overlapping provisions of the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109,[1] and the ISDA, 25 U.S.C. § 450m-1(a), (d). Pursuant to the CDA, a contractor, such as an Indian tribe seeking underpaid contract support costs, must make a claim in writing to a contracting officer at the relevant agency before it may sue in court. *See* 41 U.S.C. § 7103(a). The demand need not be detailed, and may consist of a short written statement outlining the basis of the claim, estimating damages, and requesting a final decision. *See M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1328 (Fed. Cir. 2010); *see also Arctic Slope Native Ass'n v. Sebelius* (*Arctic Slope I*), 583 F.3d 785, 797 (Fed. Cir. 2009) ("[S]ubmissions to the contracting officer need not be elaborate."). If the contracting officer denies the claim, the tribe may then follow one of two paths: (1) under the CDA, the tribe may appeal administratively within the agency or directly to the Court of Federal Claims, and then to the Court of Appeals for the Federal Circuit, 41 U.S.C. § 7104(a), (b)(1); or (2) under the ISDA, file a claim in any federal district court with jurisdiction over the relevant agency, 25 U.S.C. § 450m-1(a). *See Menominee Indian Tribe of Wisconsin v. United States* (*Menominee II*), 614 F.3d 519, 521-22 (D.C. Cir. 2010).[2] Since 1994, the

---

[1] The CDA was codified at 41 U.S.C. §§ 601-13 during the years at issue in this case. The CDA has since been recodified and renumbered. *See* 41 U.S.C. §§ 7101-09. In this opinion, we will cite to the current codification.

[2] Both paths require that a party submit a claim to a contracting officer at the relevant agency before taking further steps. *See* 41 U.S.C. § 7103(a); 25 U.S.C. § 450m-1(d) (incorporating the CDA's procedural requirements into the ISDA).

CDA has also required that all claims related to government contracts be submitted to a contracting officer within six years of the accrual of the claim. *Arctic Slope Native Ass'n, Ltd. v. Sebelius* (*Arctic Slope II*), 699 F.3d 1289, 1295 (Fed. Cir. 2012); *Menominee II*, 614 F.3d at 521.

The ISDA requires self determination contracts to contain what has proven to be a contentious proviso: that full payment of contract support costs is "subject to the availability of appropriations." 25 U.S.C. § 450j-1(b); *see also Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181, 2187 (2012). Tribes and federal agencies have disputed the meaning of that phrase for more than 20 years. Throughout the 1990s, the Departments of Interior and HHS, the two principal agencies that enter self determination contracts with Tribes that include contract support costs, read that phrase as authorizing them to pay less than the full amount of a tribe's contract support costs even when Congress had appropriated enough unrestricted funds to the agencies to fully cover those costs. *See Salazar*, 132 S. Ct. at 2187-89; U.S. Gov't Accountability Office, GAO/RCED-99-150, Indian Self-Determination Act: Shortfalls in Indian Contract Support Costs Need to Be Addressed 3-4, 32-33 (1999). As a result of pervasive reimbursement shortfalls, tribes cut ISDA services to tribal members, diverted resources from non-ISDA programs, and even forwent certain contract opportunities, hindering their progress toward self determination. U.S. Gov't Accountability Office, *supra*, at 3-4.

Tribes also began to pursue individual and collective legal claims against the federal government seeking recovery of unpaid contract support costs. *See, e.g.*, *Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631 (2005); *Shoshone-Bannock Tribes of Fort Hall Reservation v. Sec'y, Dep't of Health & Human Servs.*, 279 F.3d 660 (9th Cir. 2002); *Babbitt v.*

*Oglala Sioux Tribal Pub. Safety Dep't*, 194 F.3d 1374 (Fed. Cir. 1999); *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997); *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338 (D.C. Cir. 1996). The Menominee Tribe, however, neither filed claims with the agencies nor filed suit. It instead relied on two nationwide class actions brought by other tribes that it thought might vindicate its rights, and did not pursue its own claims more aggressively because the HHS's Indian Health Service's (IHS) consistent pattern of refusals to pay such claims led the Tribe to conclude that any such claims would be futile.

The first of two tribal class actions brought the Menominee Tribe some relief on claims that are distinct from but legally analogous to the claims at issue here, and made the Tribe somewhat complacent about these claims. That case, brought by the Ramah Navajo Chapter, sought reimbursement of contract support costs from the Secretary of the Interior and its Bureau of Indian Affairs (BIA). *See Ramah Navajo Chapter*, 112 F.3d at 1458-59, 1461. The district court in *Ramah* certified a nationwide class of all tribal contractors, even those who had not exhausted their administrative remedies under the CDA, on the ground that the case challenged the legality of the BIA's system-wide policies and practices, not the adequacy of its performance under specific contracts. Appellant Br. add. at 5a-6a (*Ramah Navajo Chapter v. Lujan*, No. CIV 90-0957 LH/RWM, Order (D.N.M. October 1, 1993)). The Menominee Tribe was a member of that class, and when the case settled, the Tribe received nearly $800,000 in compensation for BIA underpayments and equitable relief related to future BIA contract support cost payments. App. at 55, 63.

The Menominee Tribe did not fare as well in the second class action, which sought recovery from the IHS of some of

the costs that are at issue here. In 1999, the Cherokee Nation sued the Secretary of HHS on behalf of all tribal contractors, claiming that IHS had underfunded tribes' contract support costs from 1988 to the present. The suit defined the proposed class in a manner that clearly included the Menominee Tribe. *See Cherokee Nation of Okla. v. United States*, 199 F.R.D. 357, 360 (E.D. Okla. 2001). Given the Tribe's experience with the *Ramah* class, it relied on the *Cherokee Nation* class action to represent it, and did not file its own claims with IHS administratively. The district court in *Cherokee Nation*, however, denied class certification on the ground that the class lacked commonality, typicality, and adequate representation. *Id.* at 363-66. Five months later, the district court denied the Cherokee Nation's claim on the merits. *Cherokee Nation of Okla. v. United States*, 190 F. Supp. 2d 1248, 1259-61 (E.D. Okla. 2001). The Cherokee Nation appealed the merits decision but not the denial of class certification, and the Tenth Circuit affirmed. *See Cherokee Nation of Oklahoma v. United States*, 311 F.3d 1054, 1063 (10th Cir. 2002).

While that lawsuit was pending, the Cherokee Nation also pursued identical contract support costs claims against the IHS for different years through the second route provided by the CDA—an administrative proceeding before the Interior Board of Contract Appeals (IBCA).[3] The Board ruled in favor of the Cherokee Nation, *In re Cherokee Nation of Okla.*, IBCA Nos. 3877-79, 99-2 B.C.A. (CCH) ¶ 30,462, 1999 WL 440045 (IBCA 1999), and the Federal Circuit affirmed,

---

[3] The Cherokee Nation's claims against IHS—a service within HHS, not Interior—were before the IBCA because the ISDA provides that "all administrative appeals relating to [self determination] contracts shall be heard by the Interior Board of Contract Appeals." 25 U.S.C. § 450m-1(d).

*Thompson v. Cherokee Nation of Okla.*, 334 F.3d 1075, 1079 (Fed. Cir. 2003). That decision created a circuit split with the Tenth Circuit's *Cherokee Nation* decision and with a Ninth Circuit decision that had denied another tribe's claims for contract support costs. *See Cherokee Nation of Oklahoma*, 311 F.3d at 1063; *Shoshone-Bannock Tribes*, 279 F.3d at 663. The Supreme Court granted certiorari in the two *Cherokee Nation* cases to resolve the circuit split. *See Cherokee Nation*, 543 U.S. at 635-36. The Court held in the consolidated cases that, when Congress has appropriated sufficient unrestricted funds to pay a tribe's contract support costs, the government cannot avoid its contractual obligation to pay those costs on grounds of "insufficient appropriations." *Id.* at 636-38.

On September 7, 2005, six months after the Cherokee Nation's victory in the Supreme Court, the Menominee Tribe filed administrative claims with a contracting officer at the IHS to recover contract support costs for the years from 1995 through 2004. *Menominee Indian Tribe of Wis. v. United States* (*Menominee III*), 841 F. Supp. 2d 99, 101-02, 106 (D.D.C. 2012). The contracting officer denied the claims from 1996 through 1998 as untimely. Appellant Br. at 4.

The Menominee Tribe challenged that decision in federal district court, arguing that the statute of limitations should have been tolled. *See Menominee I*, 539 F. Supp. 2d at 154 n.2. The Tribe contended that, from March 5, 1999, the date the *Cherokee Nation* class action was filed, to February 9, 2001, the date the district court in that case denied class certification—a period just shy of two years—the statute of limitations governing the Tribe's claims for 1996, 1997, and 1998 should have been tolled pursuant to the doctrine of class-action tolling. *See* Pls.' Mem. in Opp'n at 30-35, *Menominee I*, 539 F. Supp. 2d 152 (No. 07-812). The Tribe argued that its claims for the years between 1996 through

1998 accrued when its self determination contract expired in 1998, and therefore all would have been timely had the limitations period been tolled for two years during the pendency of the *Cherokee Nation* motion for class certification. *Id.* at 33. In the alternative, the Tribe argued that its claims were eligible for equitable tolling. *Id.* at 35-41.

The district court rejected the Tribe's class-action and equitable tolling arguments in a footnote, *Menominee I*, 539 F. Supp. 2d at 154 n.2, affirming the contracting officer's denial of the Menominee Tribe's claims. That court held that the statute of limitations for such claims is jurisdictional and thus categorically ineligible for tolling. *Id.* An earlier panel of this court reversed in part, agreeing that the Tribe was ineligible for class-action tolling, but holding that the statute of limitations in the CDA may be subject to equitable tolling. *Menominee II*, 614 F.3d at 529. We remanded to the district court "to determine whether tolling is appropriate under the circumstances of this case." *Id.* at 531. On remand, the district court held that the Tribe's failure to timely file its claims was not one of the "extraordinary and carefully circumscribed instances" justifying the exercise of the "court's equitable power to toll the statute of limitations." *Menominee III*, 841 F. Supp. 2d at 105 (quoting *Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1057 (D.C. Cir. 1988)). This appeal followed.

## II.

The parties disagree about the appropriate standard of review. The Menominee Tribe argues that our review is de novo. The government contends that abuse of discretion is the proper standard. We need not resolve that question, however, because, even applying non-deferential de novo

review to the adverse ruling of the district court, we find that the circumstances of this case do not justify equitable tolling.

Equitable tolling is available to a party "only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland*, 560 U.S. at 649 (quoting *Pace*, 544 U.S. at 418). The Supreme Court has emphasized that equitable tolling must be applied flexibly, case by case, without retreating to "mechanical rules" or "archaic rigidity." *Id.* at 649-50 (internal quotation marks omitted). *Holland* also emphasizes that courts must keep in view equity's purposes: correcting particular injustices and "reliev[ing] hardships 'which, from time to time, arise from a hard and fast adherence' to more absolute legal rules." *Id.* (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248 (1944)).

To count as sufficiently "extraordinary" to support equitable tolling, the circumstances that caused a litigant's delay must have been beyond its control. *See Dyson v. District of Columbia*, 710 F.3d 415, 422 (D.C. Cir. 2013) (describing equitable tolling as a doctrine "meant to ensure that the plaintiff is not, by dint of circumstances beyond his control, deprived of a reasonable time in which to file suit" (brackets and internal quotation marks omitted)); *see also, e.g.*, *In re Wilson*, 442 F.3d 872, 875 (5th Cir. 2006) (per curiam); *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560-61 (6th Cir. 2000); *Harris v. Hutchinson*, 209 F.3d 325, 330-31 (4th Cir. 2000); *Sandvik v. United States*, 177 F.3d 1269, 1271-72 (11th Cir. 1999). The circumstance that stood in a litigant's way cannot be a product of that litigant's own misunderstanding of the law or tactical mistakes in litigation. When a deadline is missed as a result of a "garden variety claim of excusable neglect" or a "simple

miscalculation," equitable tolling is not justified. *Holland*, 560 U.S. at 651 (internal quotation marks omitted); *see Griffith v. Rednour*, 614 F.3d 328, 331 (7th Cir. 2010) (no tolling for a "simple legal mistake"); *Cross-Bey v. Gammon*, 322 F.3d 1012, 1015 (8th Cir. 2003) (no tolling for "lack of legal knowledge or legal resources"); *David v. Hall*, 318 F.3d 343, 346 (1st Cir. 2003) (no tolling for "routine error" and "carelessness"); *Fahy v. Horn*, 240 F.3d 239, 244 (3d Cir. 2001) (no tolling for "miscalculation[s]" and "inadequate research"); *Steed v. Head*, 219 F.3d 1298, 1300 (11th Cir. 2000) (no tolling for "miscalculation or misinterpretation"); *Harris*, 209 F.3d at 330 (no tolling for an "innocent misreading" of a statute); *see also United States v. Sosa*, 364 F.3d 507, 512 (4th Cir. 2004) (no tolling for "ignorance of the law"); *Delaney v. Matesanz*, 264 F.3d 7, 15 (1st Cir. 2001) (same); *Felder v. Johnson*, 204 F.3d 168, 172 (5th Cir. 2000) (same); *Marsh v. Soares*, 223 F.3d 1217, 1220 (10th Cir. 2000) (same); *Rose v. Dole*, 945 F.2d 1331, 1335 (6th Cir. 1991) (same); *Sch. Dist. of Allentown v. Marshall*, 657 F.2d 16, 21 (3d Cir. 1981) (same).

The Menominee Tribe faced no extraordinary circumstances because the obstacles the Tribe confronted were ultimately of its own making. The Tribe makes three arguments that "extraordinary circumstances" prevented it from timely filing its claims. We examine them in turn to explain why we ultimately conclude that, while the events the Tribe identifies were perhaps confusing or discouraging, they cannot be characterized as "extraordinary circumstances" under *Holland*.[4] At bottom, the Tribe's inadequate responses

---

[4] The *Holland* Court was explicit that equitable tolling is available to a party "only" if it shows (1) reasonable diligence and (2) extraordinary circumstances. 560 U.S. at 649; *see Ross v. Varano*, 712 F.3d 784, 802 (3d Cir. 2013) (describing a showing of

to relatively routine legal events caused it to delay pursuing its claims.  At no point was the Tribe prevented by external obstacles from timely filing.

The Menominee Tribe's first argument is that, because the *Ramah* district court certified a class action without requiring class members to exhaust administrative remedies, it was "logical to assume, as the tribe did" that the Tribe would also be a member of the *Cherokee Nation* class.  Appellant Reply Br. at 14.  The Tribe argues that it reasonably expected that, as a class member, it either could have recovered its costs through that litigation or, once the district court denied class certification, at least have the statute of limitations on its claims tolled for the two years the class certification motion had been pending, allowing it to timely file in 2005 claims that it contends accrued in 1998.

---

extraordinary circumstances as "necessary to support equitable tolling"); *Hall v. Warden, Lebanon Corr. Inst.*, 662 F.3d 745, 750 (6th Cir. 2011) (holding that a litigant seeking equitable tolling "must demonstrate both that he has been diligent in pursuing his rights and that an extraordinary circumstance prevented his timely filing"); *see also Manning v. Epps*, 688 F.3d 177, 184 & n.2 (5th Cir. 2012) (same); *Arthur v. Allen*, 452 F.3d 1234, 1252 (11th Cir. 2006) (same).  *But see Arctic Slope II*, 699 F.3d 1289 (finding equitable tolling without separately addressing the two *Holland* prongs).  Because no extraordinary circumstances stood in the Tribe's way, we need not pass on whether, under *Holland*'s first prong, the Tribe pursued its rights diligently.  Nor do we reach the Tribe's arguments that the court should consider various other equitable "factors," such as whether the government would be prejudiced by the application of equitable tolling in this case, or whether equitable tolling should be more readily available to tribes given their special relationship to the United States.

13

The flaw in the Tribe's calculations was that it was not eligible to participate in the *Cherokee Nation* class. Class-action tolling is available to members of yet-to-be-certified class actions. Under that doctrine, the "commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974). However, as we held in *Menominee II*, class-action tolling does not extend to putative class members who fail to satisfy known jurisdictional prerequisites to participation, because "[u]ntil they satisfy the jurisdictional preconditions to class membership," they know for certain they will not be members of the resulting class. 614 F.3d at 528. Knowing they cannot participate whether a class is certified or not, they "face none of the uncertainty class-action tolling is meant to ameliorate." *Id.* Therefore, in *Menominee II*, we held that because the Tribe had failed to exhaust its administrative remedies—and was therefore jurisdictionally barred from participating in the *Cherokee Nation* class—the Tribe was not entitled to class-action tolling during the pendency of the class certification motion in that case. *Id.* at 529.

The Menominee Tribe now argues that it only discovered in 2010—when we rejected its claimed entitlement to class-action tolling in *Menominee II*—that it would be ineligible for tolling on that ground. Thus, according to the Tribe, it learned the effective deadline for filing its claims after it was already too late to meet it. But the Menominee Tribe's belief that it could participate in the *Cherokee Nation* class without exhausting its administrative remedies was unjustified. Although the decision of the New Mexico district court in *Ramah* may have given the Tribe the impression that its failure to exhaust would not exclude it from the *Cherokee Nation* class, the weight of legal authority was to the contrary.

As we explained in *Menominee II*, "[t]he Federal Circuit and the Court of Claims have long held that the court may not exercise jurisdiction until the contracting officer either issues a decision on the claim or is deemed to have denied it." 614 F.3d at 526 n.3. Where exhaustion is a prerequisite to the exercise of a court's jurisdiction, "every class member must exhaust its administrative remedies." *Id*. at 526. The Tribe's reliance on *Ramah* as reason to expect that it was eligible to participate in the *Cherokee* class was the Tribe's miscalculation, not an external circumstance beyond its reasonable control.[5]

The second obstacle the Menominee Tribe identifies also fails to clear the "extraordinary circumstance" threshold. The

---

[5] A divided panel of the Federal Circuit held that equitable tolling was warranted in *Arctic Slope II*, 699 F.3d 1289, a case similar to this one, because the Tribes "took reasonable, diligent, and appropriate action as the legal landscape evolved," *id*. at 1297, and reasonably relied on *Ramah* and *Pueblo of Zuni v. United States*, 467 F. Supp. 2d 1099 (D.N.M. 2006), which the court described as "controlling legal authority . . . that [the Tribes] did not need to exhaust administrative remedies to be a class member," *id*. at 1298. The Federal Circuit also found that tolling would not disadvantage the government. *Id*. at 1297. The *Arctic Slope II* majority did not separately address *Holland*'s requirement of "extraordinary circumstances," however, beyond a concluding comment that the case involved "unique facts and extraordinary circumstances" that, together with the government's fiduciary duty to the Tribes, warranted equitable tolling. *Id*. at 1297. In our view, the *Arctic Slope II* majority failed to identify any obstacle that stood in the Tribe's way to prevent timely filing of its claims, as required by *Holland*'s second prong. We thus agree with the dissent in *Arctic Slope II* that equitable tolling was unwarranted there, as it is here, for want of an "extraordinary circumstance" under *Holland*. 699 F.3d at 1300 (Bryson, J., dissenting).

Tribe argues that the certainty of failure it confronted in bringing its claims was an impediment that stood in its way. According to the Menominee Tribe, the IHS's legal position that it was not obligated to pay contract support costs and its pattern of refusals to pay such costs meant that the Tribe confronted a legal landscape so bleak that filing a claim would have been "a fruitless exercise, with no hope of success." Appellant Reply Br. at 15. It was "obvious IHS would deny any claims," says the Tribe, given the agency's "consistent position interpreting the statute to allow it to fund less than 100% of [contract support costs]." *Id.* at 13.

The Menominee Tribe failed to take the steps it would have needed to take to preserve its claims pending judicial correction of IHS's error. A party is not excused from timely filing its claim because the agency's view of the law might be inhospitable. The federal courts, not contracting officers, are the final word on federal law, and "[t]he only sure way to determine whether a suit can be maintained is to try it." *Commc'ns Vending Corp. of Ariz. v. FCC*, 365 F.3d 1064, 1075 (D.C. Cir. 2004) (quoting *Fiesel v. Bd. of Ed. of New York*, 675 F.2d 522, 524 (2d Cir. 1982)). As we have explained, "a suitor cannot toll or suspend the running of the statute by relying upon the uncertainties of controlling law. It is incumbent upon him to test his right and remedy in the available forums." *Id.* (quoting *Fiesel*, 675 F.2d at 524-25). Even though the Tribe doubted the viability of its arguments, its claims had the same probability of success as the Cherokee Nation's claims that ultimately succeeded before the Supreme Court.

No matter how adverse the agency's legal position and the Ninth and Tenth Circuits' precedents may have been, they did not stand in the Tribe's way. Under the ISDA, tribes have some choice about where they file their claims, and thus need

not pursue their claims in jurisdictions with adverse precedent, but may proceed to any federal district court with jurisdiction over the agency where venue is proper. *See Menominee II*, 614 F.3d at 522. Before 2002, no circuit had excused the government from its obligation to fully fund contract support costs out of unrestricted appropriations. Even after the Ninth and Tenth Circuits held against other tribes on claims like the Menominee Tribe's, the Tribe could have appealed a contracting officer's claim denial in another circuit, and had something more than "no hope of success." Pursuant to the CDA, the Tribe could also have obtained review in the Court of Appeals for the Federal Circuit. Until 2003, that court had not yet settled the question whether the government had a contractual obligation to pay tribal contractors for all their contract support costs, and by 2003— two years before the Supreme Court decided *Cherokee Nation*—had ruled in favor of plaintiffs on claims essentially identical to the Menominee Tribe's. *See Thompson*, 334 F.3d at 1087-88. From that point onward, the Tribe could have appealed to that court and won.

Even assuming the Menominee Tribe lacked the resources to pursue its own litigation in federal court, its eligibility to participate in the *Cherokee Nation* class would have required nothing more than some paperwork. The procedure for exhausting administrative remedies is simple, and the Tribe has not argued otherwise. *See Menominee III*, 841 F. Supp. 2d at 102 (explaining that pursuing a CDA claim "'need not be elaborate' and can be reflected in letters alone" (quoting *Arctic Slope I*, 583 F.3d at 797)). Even if a contracting officer were to deny the Menominee Tribe's claim, exhaustion of administrative remedies would have made the Tribe eligible to participate in the *Cherokee Nation* class, and thus entitled it to class-action tolling while the motion for class certification was pending in that case. What

stood between the Tribe and class-action tolling was little more than an envelope and a stamp.

The Menominee Tribe cites cases holding that a lack of clear legal precedent might constitute an extraordinary circumstance. *See, e.g.*, *Harris v. Carter*, 515 F.3d 1051 (9th Cir. 2008); *Capital Tracing, Inc. v. United States*, 63 F.3d 859 (9th Cir. 1995). We do not disagree. One can imagine circumstances in which the law might be so unfavorable that it functions as an obstacle and perhaps even rises to the level of an extraordinary circumstance. In *Harris* and *Capital Tracing*, for example, the parties relied "in good faith on then-binding circuit precedent" in deciding when and how to file their claims. *Harris*, 515 F.3d at 1055; *see Capital Tracing*, 63 F.3d at 863. Because it was only as a result of the reversal of previously binding precedent that the parties' claims became untimely, the courts determined that equitable tolling was appropriate. The general rule, however, is that legal decisions based on unclear or contrary precedent justify equitable tolling in only the rarest instances. *See Boling v. United States*, 220 F.3d 1365, 1374 (Fed. Cir. 2000) (declining to equitably toll statute of limitations even where the underlying action appeared futile during the limitations period).

Finally, even if no single circumstance stood in its way, the Menominee Tribe argues, the Court should consider all the factors that the Tribe faced as jointly amounting to an "extraordinary" obstacle. The Tribe points to "the breadth and complexity of [the contract support costs] litigation involving hundreds of tribes, the precedent of a similar prior class action in which the Tribe was a member of the class, the unique government-to-government and trust relationship between the United States and the Tribe, and the unsettled case law regarding the legal standard governing the

Government's duty to pay full [contract support costs] under the ISDA." Appellant Br. at 17.

That argument fails because none of the many factors the Tribe identifies are external obstacles that prevented the Tribe from bringing its claims. Some are not obstacles. Neither the "unique government-to-government and trust relationship between the United States and the Tribe," *id.* at 17, nor the "litigation history" surrounding contract support costs claims, *id.* at 19, were capable of standing in the Tribe's way. Others we cannot accept. If a lawsuit's "breadth and complexity" were an "extraordinary circumstance," few statutes of limitations would function. And the remaining circumstances—the Tribe's mistaken belief that it would be entitled to class-action tolling and that its claims had no hope of success—were the Tribe's own missteps. On the facts of this case, we cannot conclude that a series of events, none extraordinary on its own, piled up to create an extraordinary obstacle.

## III.

The Menominee Tribe also appeals the denial of two "stable-funding" claims—that is, claims that the Tribe was entitled to contract support cost funding in 1999-2000 at least as high as that paid by the government in 1998. The parties appear to agree, and the court below held, that those claims are time barred unless the limitations period on the Tribe's 1997 and 1998 claims is tolled. *See Menominee III*, 841 F. Supp. 2d at 111; Appellant Br. at 48-49; Appellee Br. at 47. Because, for the reasons discussed above, the circumstances here do not warrant equitable tolling on the Tribe's 1997 and 1998 claims, we affirm the judgment of the district court dismissing the Tribe's 1999-2000 stable funding claims.

19

\* \* \*

Delays caused by a party's inauspicious legal judgments are not "extraordinary circumstance[s]" sufficient to justify equitable tolling. Faced with a variety of reasonable litigation options, the Menominee Tribe chose to wait and see if more favorable law would appear. In so doing, the Tribe allowed its claims to expire. Because we find that no obstacle stood in the Menominee Tribe's way of bringing the claims within the limitations period, the judgment of the district court is affirmed.

*So ordered.*