ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeals of --                                    )
                                                 )
Kamaludin Slyman CSC                             )        ASBCA Nos. 62006, 62007, 62008
                                                 )
Under Contract No.  H92237-12-C-0089             )

APPEARANCES FOR THE APPELLANT:          Bryant S. Banes, Esq.
                                        Sean D. Forbes, Esq.
                                          Neel, Hooper & Banes, P.C.
                                          Houston, TX

APPEARANCES FOR THE GOVERNMENT:         Jeffrey P. Hildebrant, Esq.
                                          Air Force Deputy Chief Trial Attorney
                                        Christopher M. Judge, Esq.
                                        Kyle E. Gilbertson, Esq.
                                          Trial Attorneys

DECISION OF THE BOARD BY THE SENIOR DECIDING GROUP

OPINION BY ADMINISTRATIVE JUDGE PROUTY

        For more than a decade, this Board has held that a typed signature block does not
meet the requirement for a signature necessary for claims certification pursuant to the
Contract Disputes Act, 41 U.S.C. §§ 7101-7109, (CDA).  *See, e.g.*, *NileCo General
Contracting LLC*, ASBCA No. 60912, 17-1 BCA ¶ 36,862; *ABS Development Corp.*,
ASBCA No. 60022 *et al.*, 16-1 BCA ¶ 36,564; *Tokyo Company*, ASBCA No. 59059,
14-1 BCA ¶ 35,590; *Teknocraft Inc.*, ASBCA No. 55438, 08-1 BCA ¶ 33,846.  We have,
however, also held that a "digital signature," created by software requiring the use of
some sort of unique identification, could satisfy the CDA's certification requirement.
*URS Federal Servs., Inc.*, ASBCA No. 61443, 19-1 BCA ¶ 37,448.  Although
e-commerce has been with us for longer than the period of time encompassed by these
decisions, the Board's own movement to an e-filing system, the continued increase in the
use of digital conventions for transacting business in greater society, and the implications
of our reasoning in *URS* have given us reason to revisit the subject.[1]  The matter before
us, in which we decide a government motion to dismiss appellant Kamaludin Slyman
Construction and Supply Company's (Kamaludin's) appeals for failure to originate upon
a claim certified with what the government considers to be a proper signature, presents us
such an opportunity.  Today, we hold that, so long as a mark purporting to act as a

---

[1] Because we have precedent of our own directly on point, any change of this rule of law
        for the Board must be accomplished through the Senior Deciding Group, unless it
        is reversed by our reviewing court, the Court of Appeals for the Federal Circuit.
        *SWR, Inc.*, ASBCA No. 56708, 15-1 BCA ¶ 35,832 at 175,220.

signature may be traced back to the individual making it, it counts as a signature for purposes of the CDA, whether it be signed in ink, through a digital signature application, or be a typed name.

## STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

The Combined Joint Special Operations Task Force-Afghanistan awarded the above-captioned contract (the contract) to Kamaludin for the lease of certain heavy equipment in Afghanistan on December 23, 2011. The box identifying Kamaludin on the first page of the contract included the email address, K***.[2] In addition to many other provisions, the contract incorporated by reference the standard Federal Acquisition Regulation (FAR) Disputes clause, FAR 52.233-1, DISPUTES. (R4, tab 14 at 1, 4, 8) The Disputes clause requires that any claim exceeding $100,000 be certified. FAR 52.233-1(d)(2)(i).

By letter dated March 16, 2013, Kamaludin submitted a demand for payment in the amount of $155,500.00. Kamaludin's letter alleged that the government breached the contract by moving the equipment from the agreed upon place of performance to two different locations and also kept the equipment for five months after the lease expired. The letter contained a subject line which stated, "Letter of Claim." It also contained a handwritten signature from Kamaludin's president. The letter did not contain any reference to the CDA's claim certification language. (R4, tab 19 at 4)

An email to the Air Force dated March 11, 2019 from the K*** email address is below reproduced exactly as it appeared:

Hey Sir,

*For contract numbers -12-C-0089, -12-C-0131, -11-C-0322, and the claims submitted in respect to them on March 16, 2013, I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.*

*Sincerely,*
*Kamaludin Slyman*

(R4, tab 19 at 1; tab 20 at 1[3])

---

[2] Following our usual practice, we do not replicate the full email address in this published decision, but represent it as K*** throughout.

[3] The email received by the government, as reproduced in tab 19 of the Rule 4 file, automatically reduced the email address in the "From" header to "Kamaludin Slyman," but, as reflected in tab 20 of the Rule 4 file, the same email was forwarded by Kamaludin's counsel to the government and, in its forwarded state,

On March 14, 2019, Kamaludin filed a notice of appeal with the Board, which we docketed as ASBCA No. 62006.[4]  The notice of appeal stated that this was an appeal from the deemed denial of appellant's March 16, 2013 claim.[5]

DECISION

I. <u>A CDA Claim in an Amount Greater Than $100,000 Must be Certified, Which Requires a Signature.</u>

The CDA requires the certification of claims "of more than $100,000."  41 U.S.C. § 7103(b).  This certification is required to be "executed by an individual authorized to bind the contractor with respect to the claim" and must state that:

    (A)  the claim is made in good faith;

    (B)  the supporting data are accurate and complete to the best of the contractor's knowledge and belief;

    (C)  the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable; and

---

the reproduction also includes the K*** email address in brackets next to the Kamaludin Slyman name in the "From" header.

[4] Appellant has two additional appeals (ASBCA Nos. 62007 and 62008), which are consolidated with this appeal.  The allegations in those appeals involve claims under $100,000.  As such, the adequacy of the claim certification has no bearing on our jurisdiction in those appeals.  We also note that the government's motion sought dismissal for failure to state a claim upon which relief can be granted in ASBCA No. 62007.  We will not address that portion of the government's motion in this decision given that nothing in it requires consideration by the Senior Deciding Group.

[5] Nearly six years passed between appellant's demand for payment and its notice of appeal.  However, only three days passed between appellant's purported claim certification and its notice of appeal.  The government had the opportunity to argue that the appeal was premature when it filed its motion to dismiss on April 30, 2019.  Instead, perhaps understandably, the government chose to focus its motion on the adequacy of the claim certification.  At this point, far more than 60 days have passed from the date of the claim certification and the contracting officer has not issued a final decision.  Under the circumstances, we see no useful purpose in dismissing the appeal as premature and requiring appellant to refile.  *See ABS Development Corp.*, ASBCA No. 61042 *et al.*, 17-1 BCA ¶ 36,784.

3

(D) the certifier is authorized to certify the claim on behalf of the contractor.

41 U.S.C. § 7103(b).

"It is well settled that certification is a jurisdictional prerequisite for this Board for contractor claims over $100,000." *Special Operative Grp., LLC*, ASBCA No. 57678, 11-2 BCA ¶ 34,860 at 171,480 (citation omitted). Although a defective certification does not deprive the Board of jurisdiction, 41 U.S.C § 7103(b)(3), the failure to certify at all does deprive the Board of jurisdiction and mandates dismissal. *Special Operative Group*, 11-2 BCA ¶ 34,680 at 171,480; *CCIE & Co.*, ASBCA Nos. 58355, 59008, 14-1BCA ¶ 35,700 at 174,816; *Baghdadi Swords Co.*, ASBCA No. 58539, 13 BCA ¶ 35,395 at 173,665.

And, as far as the law is concerned, an unsigned certification is considered to be not merely defective, but no certification at all. This is because the "execution" of a CDA certification requires a "certifier to sign the claim certification," *Teknocraft*, 08-1 BCA ¶ 33,846 at 167,504 (citing *Hawaii CyberSpace,* ASBCA No. 54065, 04-1 BCA ¶ 32,455 at 160,535), thus making the failure to sign the certification language into the equivalent of "failure to certify," which may not be remedied. *Hawaii CyberSpace*, 04-1 BCA ¶ 32,455 at 160,535; *see also Tokyo Company*, 14-1 BCA ¶ 35,590 at 174,392.[6]

II. <u>What Makes a Valid Signature?</u>

The CDA does not define signature, thus we turn to the FAR for its definition.[7] *See, e.g.*, *URS*, 19-1 BCA ¶ 37,448 at 181,967. There, it is defined as "the discrete, verifiable symbol of an individual which, when affixed to a writing with the knowledge and consent of the individual, indicates a present intention to authenticate the writing. This includes electronic symbols." FAR 2.101. In the past, we have looked at this definition as having two components: whether the symbol purporting to be the signature is "discrete" and whether it is "verifiable," with "verifiable" being the more critical of the two terms. *E.g.*, *URS*, 19-1 BCA ¶ 37,448 at 181,967-68. Here, we think it may also be helpful to consider a third element: whether the symbol indicates the present intention to authenticate the writing to which it is affixed.

---

[6] Judge Hartman's concurrence in result contends that the Federal Circuit's recent decision in *Dai Global, LLC v. Adm'r of the U.S. Agency for Int'l Dev.*, 945 F.3d 1196 (Fed. Cir. 2019), has effectively overruled these cases. Without deciding the matter, we are not so certain that *Dai Global* goes that far. In any event, because we find herein that the certification was signed, we do not reach the issue of whether lack of signature is a curable defect.

[7] The FAR has been used elsewhere to flesh out the meaning of terms in the CDA, notably, for the pivotal word, "claim." *E.g.*, *H.L. Smith, Inc. v. Dalton*, 49 F.3d 1563, 1564-65 (Fed. Cir. 1995).

A.   The Meaning of a "Discrete" Symbol

In *URS* we selected a typical dictionary definition of "discrete," which was that it was "separate and distinct."  *URS*, 19-1 BCA ¶ 37,448 at 181,968.  This remains a satisfactory definition.

B.   "Verifiable" Means That a Mark Can Be Tied to an Individual

*URS* turned on the meaning of "verifiable."  In it, we held that, "if one can later establish that a mark is tied to an individual, it is verifiable."  *URS*, 19-1 BCA ¶ 37,448 at 181,968.  We continue to find this to be an appropriate definition.  As discussed in *URS*, our practice (and the practice of other bodies) in accepting "ink" signatures, when neither the government recipient of the certification nor the reviewing court might have any basis to recognize, on its face, that the handwritten mark comes from a particular individual, argues for an expansive reading of "verifiable."  Moreover, we see no policy grounds for an overly-narrow reading of this phrase.

We and our reviewing court, the United States Court of Appeals for the Federal Circuit, have long held that the purpose of the CDA's certification requirement is to encourage accurate claims and to discourage (through the potential of civil and criminal penalties) the submission of unfounded claims to the contracting officer.  As we said in *Hawaii CyberSpace*:

> "The purposes of the certification requirement are to discourage the submission of unwarranted contractor claims and to encourage settlements," *Paul E. Lehman, Inc. v. United States*, 673 F.2d 352, 354, 230 Ct. Cl. 11, 14 (1982); "to push contractors into being careful and reasonably precise in the submission of claims to the contracting officer," *Tecom, Inc. v. United States*, 732 F.2d 935, 937 (Fed. Cir. 1984); and to enable the government "to hold a contractor personally liable for fraudulent claims," *Transamerica Insurance Corp.* v. *United States*, 973 F.2d 1572, 1580 (Fed. Cir. 1992).

04-1 BCA ¶ 32,455 at 160,533; *see also Teknocraft*, 08-1 BCA ¶ 33,846 at 167,505 (signing claim is necessary for holding the signer responsible for falsities contained within it).

The policy goal of requiring signatures to deter fraud, though, is bottomed upon the notion of its use to identify the person making the false claim so that the claimant can be held accountable for it.  Hence, we rejected typed "//signed//" (above a typed name as a signature) in *Teknocraft*, and a typed name in *ABS*.  In *Teknocraft*, we stated that "[w]ithout a signature, the purported author of the certification could just as easily disavow the certification because "//signed//" cannot be authenticated."  08-1 BCA

¶ 33,846 at 167,505.  In *ABS* (relying on *Teknocraft*), we used similar language, stating that "a typewritten name, even one typewritten in Lucida Handwriting font, cannot be authenticated . . . .  [A]nyone can type a person's name; there is no way to tell who did so from the typewriting itself."  16-1 BCA ¶ 36,564 at 178,099.  *NileCo*, too, followed the *Teknocraft* line of cases without particular elaboration.  *See* 17-1 BCA ¶ 36,862 at 179,606.

Thus, our conclusions in the prior cases requiring signatures to deter fraud were about identification and were not premised on the notion that the legal jeopardy attaching to an individual submitting a false claim is any different if the signature is in notarized ink than if it is a typed "X" purporting to stand for the individual.  Nor could they be.  The CDA's fraud provision, 41 U.S.C. § 7103(c)(2), requires only a misrepresentation of fact or fraud in the claim, and, in fact, makes no distinction between claims of a monetary value that must be certified and those which need not be.  Thus, signature is immaterial to the applicability of this anti-fraud provision.  The False Claims Act, 31 U.S.C. § 3729, prohibits and punishes presentment of false claims or false records or materials to the government, but does not hinge upon there being accompanying signatures of any form.  Likewise, the general federal false official statement criminal statute, 18 U.S.C. § 1001, makes no reference to signatures, whether they be ink, typewritten, or non-existent.  For the perpetrator to be liable under the law, it is enough that the perpetrator use a materially false statement, representation, writing, or document.  18 U.S.C. § 1001(a).

As Judge Posner noted almost 20 years ago in a Uniform Commercial Code case involving an exchange of emails, although a written signature may perhaps be better evidence of identity than a typed one[8], "the sender's name on an e-mail satisfies the signature requirement of the statute of frauds."  *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 296 (7th Cir. 2002).

Thus, we conclude that a signature which is verifiable in the sense that it permits a determination of which individual is responsible for the claim, satisfies the anti-fraud policy objectives which are the reason for the CDA's certification requirement.  And this is so whatever form the "signature" takes.  *Teknocraft* and those cases following it did not allow for this possibility, and are expressly overruled to the extent that they, *per se*, preclude the use of a typed name, in conjunction with other evidence of the author's identity, from constituting a signature for purposes of CDA certification.

C.  The Present Intention To Authenticate

The final component of the definition of signature in the FAR is that it demonstrate a present intention to authenticate the writing.  That is generally read as a party's affixing its name at the end of a document.  In *Hamdi Halal Market LLC v. United States*, 947 F.Supp.2d 159 (D. Mass. 2013), the district court applied the

---

[8] As discussed below, an email may, in fact, provide better proof of identity than an ink signature.

Electronic Signatures in Global and National Commerce Act, 15 U.S.C. §§ 7001-7006 (the ESIGN Act) and recognized that even a typed name at the end of a document could convey the intent to authenticate. *See* 947 F.Supp.2d at 164-65; *cf. Cloud Corp.*, 314 F.3d at 296 (same result, but not considering ESIGN Act). Whether the ESIGN Act strictly applies to CDA certifications is beside the point in our deciding this matter.[9] For purposes of answering the question of what intent is demonstrated by a typed name at the end of a document, the world in which the ESIGN Act applies to most commercial transactions is a world in which the use of a name at the end of an email conveys the intent to authenticate the writing therein.

III. <u>The Typed Name at the End of the Email Here Counts as a Signature For Purposes of Claim Certification</u>

Because the typed name at the end of the end of the March 11, 2019 email is a discrete verifiable mark made with intent to authenticate, it constitutes a signature sufficient for the CDA's certification purposes.

To be sure, a typed name, without more, does nothing to verify the identity of the person submitting it (the point we made in *ABS* being well-taken), but we have more here. Crucially, the name came from an email correspondence which demonstrates that the document came from the sender's email address. If we can satisfy ourselves that the email address is linked to the certifier (and there are numerous ways we may do that, including the practice of the government in communicating with Kamaludin during contract performance through that very same email address), then the signature is verifiable. Though the government argues that a typewritten name on an email is an unreliable marker of identity (thus implying that email, itself, is such an unreliable identifier) (*see* gov't reply at 8-11), we find this concern to be exaggerated and not any different than the risks of forged signatures in ink. In a thoughtful opinion permitting email documents to be authenticated by virtue of the email addresses, the district court in *United States v. Safavian*, 435 F. Supp. 2d 36 (D. D.C. 2006), rejected the notion that email was particularly subject to alteration compared to, say, paper records:

> While the defendant is correct that earlier e-mails that are
> included in a chain – either as ones that have been forwarded
> or to which another has replied – may be altered, this trait is
> not specific to e-mail evidence. It can be true of any piece of
> documentary evidence, such as a letter, a contract or an
> invoice. Indeed, fraud trials frequently center on altered
> paper documentation, which, through the use of techniques
> such as photocopies, white-out, or wholesale forgery, easily

---

[9] Kamaludin argues that it does (app. resp. at 2 n.1); the government argues that it does not (gov't reply at 2-5). But the FAR's definition of signature expressly permits the use of electronic symbols, which is the whole point Kamaludin is attempting to make through its reference to the ESIGN Act (app. resp. at 2 n.1).

can be altered.  The *possibility* of alteration does not and cannot be the basis for excluding e-mails as unidentified or unauthenticated as a matter of course, any more than it can be the rationale for excluding paper documents (and copies of those documents).  We live in an age of technology and computer use where e-mail communication now is a normal and frequent fact for the majority of this nation's population, and is of particular importance in the professional world.

435 F. Supp. 2d at 41.

Indeed, other courts have routinely found an email address, combined with other indicia within the email, to be sufficient to authenticate the email for admission as evidence.  In *United States v. Siddiqui*, 235 F.3d 1318 (11th Cir. 2000), the court of appeals upheld the trial court's decision to admit emails written by the criminal defendant in a fraud case, and considered the email address and the content of the emails to be sufficient circumstantial evidence that they originated from the defendant.  235 F.3d at 1322-23.  In *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534 (D. Md. 2007), the district court recognized *Siddiqui* and other cases that supported a finding that email addresses provide circumstantial proof of authorship, *see* 241 F.R.D. at 546, 554, and even suggested that there might be room for a business email to be self-authenticating. *Id*. at 554.  Numerous other courts have followed suit.  *See*, *e.g.*, *Am. Fed'n of Musicians of United States & Canada v. Paramount Pictures Corp.*, 903 F.3d 968, 976 (9th Cir. 2018); *United States v. Fluker*, 698 F.3d 988, 999-1000 (7th Cir. 2012) (circumstantial evidence of authorship of email); *Copeland Corp. v. Choice Fabricators Inc.*, 345 F. App'x 74, 77 (6th Cir. 2009) (email from known email address with typed name at end is considered "signed"); *cf. Cloud Corp.* 314 F.3d at 296.

At this stage of the proceedings, we are satisfied that the typed name at the end of the email from the same email address with which the government corresponded with Kamaludin is a discrete and verifiable mark made with the intent to authenticate the certification and we have no basis to suppose that any other individual would have reason to falsify the signature.  Thus, we treat it as we would a handwritten mark purporting to be a signature or a digital signature – no better, no worse:  absent the later production of evidence proving otherwise, we find that the claim that is the basis of ASBCA No. 62006 is certified.

8

CONCLUSION

Because the typed name of Mr. Slyman following the certification language in his March 11, 2019 email satisfied the signature requirement for Kamaludin's claim, the government's motion to dismiss is denied. Because of this result, we need not reach Kamaludin's additional arguments regarding the absence of a signature being a curable defect (app. resp. at 4-5) or the government's supposed waiver of the signature requirement (*id*. at 5-6) – both of which appear to be contrary to our precedent in any event.

Dated: September 25, 2020

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL T. PAUL
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

I concur

REBA PAGE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

CHERYL L. SCOTT
Administrative Judge
Armed Services Board
of Contract Appeals

I concur in result (see separate opinion)

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur in result (see separate opinion)

TERRENCE S. HARTMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur in result (see separate opinion)

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

I concur in result (see separate opinion)

TIMOTHY P. MCILMAIL
Administrative Judge
Armed Services Board
of Contract Appeals

SEPARATE OPINION BY ADMINISTRATIVE JUDGE CLARKE

I concur in the result and the reasoning of the majority which finds the typed signature block to be a signature in these circumstances, although I believe that *Teknocraft* and the cases that followed it may be distinguished on the facts and need not be overruled to obtain this result.

Dated: September 25, 2020

_____
CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

## SEPARATE OPINION BY ADMINISTRATIVE JUDGE HARTMAN

I concur in the result because I agree with the concurring opinions of Judges McIlmail and Melnick that the email here is not a valid CDA claim certification. I note simply that the Federal Circuit's recent decision in *Dai Global, LLC v. Adm'r of the U.S. Agency for Int'l Dev.*, 945 F.3d 1196 (Fed. Cir. 2019), effectively has overruled our prior line of precedent that unexecuted documents, such as the email here, do not constitute a "defective certification" that later can be corrected.

Dated: September 25, 2020

TERRENCE S. HARTMAN
Administrative Judge
Armed Services Board
of Contract Appeals

SEPARATE OPINION BY ADMINISTRATIVE JUDGE MELNICK

I concur in the result that the motion to dismiss should be denied. Though the email is not a valid CDA certification, it is a defective certification that can be corrected.

I. Email

The CDA requires a contractor to certify that a claim exceeding $100,000 meets the statute's well-known criteria. 41 U.S.C. § 7103(b). In the nearly half century since the CDA was enacted, the Board has never found that a conventional email is a satisfactory certification. In fact, it has held the opposite multiple times. It was correct.

Congress ascribed great importance to the certification requirement so as to discourage unwarranted claims. *Paul E. Lehman, Inc. v. United States*, 673 F.2d 352, 354 (Ct. Cl. 1982). It is also well established that the CDA, along with its certification requirement, is a waiver of sovereign immunity. *Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1370 (Fed. Cir. 2009). As such, its language must be strictly construed, or construed narrowly. *Id*. at 1370, 1373. Strictly applying the legal definition in use at the time of enactment, to certify means "to testify in writing." *Certify*, *Black's Law Dictionary* (rev. 4th ed. 1968). In turn, to "testify" is "to bear witness; to give evidence as a witness." *Testify*, *Black's Law Dictionary* (rev. 4th ed. 1968).

These definitions suggest that a certification evokes a degree of formality. Merely firing off a run-of-the-mill email reciting the language in section 7103(b) does not rise to the level of formally giving testimony or evidence as a witness, just as I think an email fails to satisfy the requirements for making a declaration under 28 U.S.C. § 1746. It is proper under these definitions to expect more. Indeed, appellant has failed to cite, nor have I found, any precedent holding that a certification mandated by a federal statute can be made in an email. Considering the significance of the CDA certification to Congress, I am confident that if squarely confronted with that question it would have expected something more solemn than an email.

Up until now the Board's holdings have comported with my conclusion, though it has analyzed the matter differently. Rather than concentrate upon the meaning of the word "certify," the Board has found that the generic definition of the word "signature" contained in FAR 2.101 controls whether an email is a certification. That provision requires a symbol that is discrete and verifiable. I would not have taken this approach because nothing in the FAR indicates that its definition of "signature" also defines the word "certify" in section 7103(b). Regardless, the Board has found that emailed certification language accompanied only by a typed name is not sufficiently discrete and verifiable to support a certification. *Teknocraft Inc.*, ASBCA No. 55438, 08-1 BCA ¶ 33,846; *see also Nileco Gen. Contracting LLC*, ASBCA No. 60912, 17-1 BCA ¶ 36,862; *ABS Dev. Corp.*, ASBCA No. 60022, 16-1 BCA ¶ 36,564; *RECO Rishad Eng. Constr. ORG*, ASBCA No. 60444, 16-1 BCA ¶ 36,558. Viewed through the Board's chosen lens, these conclusions make sense. Email accounts are commonly used by more

13

than one individual. That is not typically the case for either "wet" or digital signatures. Email accounts can be cancelled. Email accounts can be hacked. There is little basis to conclude an email is any more trustworthy than a typed name on company letterhead. That is not adequate.

Appellant now asks the Board to change its mind and repudiate its well established precedent rejecting emailed certifications. I agree with Judge McIlmail that the doctrine of stare decisis requires adherence to the Board's past holdings. Stare decisis enhances predictability and efficiency by establishing settled expectations through prior rulings. *Decker Corp. v. United States*, 752 F.3d 949, 956 (Fed. Cir, 2014). Explaining why reexamination of well-settled precedent can be harmful, the Supreme Court has said:

> Justice Brandeis once observed that "in most matters it is more important that the applicable rule of law be settled than that it be settled right." To overturn a decision settling one such matter simply because we might believe that decision is no longer "right" would inevitably reflect a willingness to reconsider others. And that willingness could itself threaten to substitute disruption, confusion and uncertainty for necessary legal stability.

*John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2008) (quoting *Burnet Coronado Oil & Gas Co.*, 285 U.S. 393, 406 (1932) (dissenting opinion)). Stare decisis directs us to disfavor revisiting a debate simply because reasonable arguments continue to exist on both sides. *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1283 (Fed. Cir. 2014) (en banc), *vacated sub nom. Lighting Ballast Control LLC v. Universal Lighting Techs., Inc.*, 135 S. Ct. 1173 (2015) (quoting *Morrow v. Balaski*, 719 F.3d 160, 181 (3rd Cir. 2013) (Smith, J. concurring)).

Of course, the Board recognizes stare decisis. *See Boeing Co.*, ASBCA No. 30404, 86-3 BCA ¶ 19,314. Furthermore, stare decisis applies to the Senior Deciding Group's reconsideration of issues previously decided (here multiple times) by our panels. This is because the panel decisions reflect Board precedent entitled to due regard for its value to the law's stability, requiring good and sufficient reasons to reject it at a later date. *See Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1316 (Fed. Cir. 2013) (en banc) (explaining that stare decisis concerns apply to court of appeals panel opinions when the issues decided are reconsidered by the en banc court). Finally, stare decisis has special force upon a prior interpretation of a jurisdictional statute. The reason is that the statute can always be changed. *John R. Sand & Gravel Co. v. United States*, 552 U.S. at 139; *but cf. Procopio v. Wilkie*, 913 F.3d 1371, 1380 n.7 (Fed, Cir. 2019) (en banc) (observing that it is not the case that a statute's interpretation can never be overruled).

I am unaware of anything happening in the three years since the Board most recently rejected emailed certifications in *Nileco* that overcomes the special stare decisis

force upon our settled law. The appellant has not identified any intervening development showing the national body of law applicable to statutorily mandated certifications is moving counter to us. There is also no other basis for making such a radical change. The Board has recently recognized certifications executed with digital signatures that use unique software generated identifiers. *URS Fed. Servs., Inc.*, ASBCA No. 61443, 19-1 BCA ¶ 37,448. These distinct devices are regularly used in formal transactions. And a claimant may always send its certification with a traditional wet signature. This requires little more than an envelope and postage. *See Menominee Indian Tribe of Wis. v. United States*, 764 F.3d 51, 61 (D.C. Cir. 2014), *aff'd*, 136 S. Ct. 750 (2016). Neither option presents an unusual burden. Moreover, if traditional wet signatures (which have customarily been accepted for generations) pose the potential for falsification, we should not compound that risk by now accepting emails with all of their own verification problems. The Board's current law is thoroughly reasonable and consistent with the formality associated with a certification. For these reasons, I would reject common emails that purport to certify claims under section 7103(b).

II. Correction of a Defective Certification

Where I do part ways with the Board's prior law is with its refusal to recognize that an email is a sufficient attempt at a certification to be correctible. As it is also well known, a defective certification does not deprive the Board of jurisdiction. It can be corrected. 41 U.S.C. § 7103(b)(3). As far as I can tell, the Board first held in *Hawaii Cyberspace*, ASBCA No. 54065, 04-1 BCA ¶ 32,455, that a purported certification containing a typed signature is not subject to correction. The Board stated in a somewhat conclusory fashion that the legislative purposes for certification dictate that "the failure to sign is more akin to a 'failure to certify'" and is therefore not curable. *Id*. at 160,535. However, since then the right to correct defective certifications has been readily applied at the appellate level. Nontechnical defects are correctible. Even a defect arising from an intentional, reckless, or negligent disregard for the applicable certification requirements is correctible. *Dai Global, LLC v. Adm'r of the United States Agency for Int'l Dev.*, 945 F.3d 1196 (Fed. Cir. 2019). The legislative purposes for permitting correction dictate allowing it here. Accordingly, though I would reject appellant's request that we deem its emailed certification valid, I concur in the result that the government's motion to dismiss should be denied.

Dated: September 25, 2020

_____
MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

I concur in the result.  I agree with Judges Melnick and Hartman that, following *Dai Global v. Administrator of the United States Agency for International Development*, 945 F.3d 1196 (Fed. Cir. 2019), the certification is defective, but curable.  I do not agree that the certification here was signed.  The legal doctrine of stare decisis requires us, absent special circumstances, to treat like cases alike.  *June Med. Servs. L. L. C. v. Russo*, No. 18-1323, 2020 WL 3492640, at *22 (U.S. June 29, 2020) (Roberts, C.J., concurring).  The question whether the certification is signed is controlled by our decisions of only a few years ago; no special circumstance justifies a different conclusion.  *See id*. at *29.

Additionally, from *Fid. & Deposit Co. of Maryland v. United States*, 2 Cl. Ct. 137, 144 (1983) (emphasis added), comes the following legislative history:

> Admiral Rickover was the prime mover of the certification provisions before the Congress. At hearings on the CDA on June 14, 1978, he advised that the new law should:
>
> "[r]equire as a matter of law that prior to evaluation of any claim, the contractor must submit to the Government a certificate signed by a senior responsible contractor official, which states that the claim and its supporting data are current, complete and accurate. *In other words, you put the contractor in the same position as our working man, the income tax payer who must certify his tax return....*"
>
> Contract Disputes Act of 1978: Joint Hearings on S.2292, S.2787 & S.3178 Before the Subcomm. on Federal Spending Practices and Open Government of the Senate Comm. on Governmental Affairs and the Subcomm. on Citizens and Shareholders Rights and Remedies of the Senate Comm. on the Judiciary, 95th Cong., 2d Sess. 21 (1978).
>
> The Court of Claims cited this testimony in Paul E. Lehman, Inc. and commented notably on the legislative history of the CDA:
>
> "Admiral Rickover wanted to deter contractors from filing inflated claims which cost the Government substantial amounts to defeat. He sought to do so by subjecting contractors to financial risk if their claims were unreasonable.... [He] viewed the certification requirement as a necessary prerequisite to the consideration of any claim. The provisions Congress adopted to include the certification requirement were based upon Admiral Rickover's written

16

suggestions and fairly must be deemed to have incorporated his view concerning the effect of the certification requirement. [citing *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 31–32, 102 S. Ct. 821, 830–31, 70 L. Ed. 2d 792 (1982)] .... "The import of the language of the Act and its legislative history is that unless a claim has been properly certified, it cannot be considered under the statute..... Unless that requirement is met, there is simply no claim that this court may review under the Act." *Id*. at ——, 673 F.2d at 355.

In view of that history, our precedent reflects a perfectly reasonable position, particularly given the importance of the certification requirement. It is not too much to ask that a contractor affix a hand-written signature or what we all understand to be a "digital" signature to express ceremoniously his solemn vow (much like witnesses raise right hands to give their oaths to provide truthful testimony) that:

[t]he claim is made in good faith, the supporting data are accurate and complete to the best of the contractor's knowledge and belief, the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable, and the certifier is authorized to certify the claim on behalf of the contractor.

Indeed, not only have we followed our precedent several times in recent years, the Government Accountability Office expressly followed our lead only two years ago in *Distributed Solutions, Inc.*, B-416394 (Aug. 13, 2018). In this sense, our change in direction is a solution in search of a problem. What box this watering-down will open, and what slippery slope this unwarranted and unnecessary relaxation establishes (presumably requiring litigation to sort out, including, perhaps, in the United States Court of Federal Claims and federal district courts handling fraud and false claims cases), we can only guess.

Dated: September 25, 2020



TIMOTHY P. MCILMAIL
Administrative Judge
Armed Services Board
of Contract Appeals

17

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62006, 62007, 62008, Appeals of Kamaludin Slyman CSC, rendered in conformance with the Board's Charter.

Dated:  September 29, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals